# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

JAMES HUGGARD[1],
      Plaintiff

        vs

UNITED PERFORMANCE
METALS, INC.,
      Defendant.

Case No. 1:10-cv-63
Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

      Plaintiff James Huggard brings this action against his former employer United

Performance Metals, Inc. ("UPM") pursuant to the Court's original jurisdiction under the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* (Count I); the Americans

with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101, *et seq.* (Count III); and the

Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.* (Count V).

Plaintiff also brings state law claims for age and disability discrimination and retaliation (Counts

II, IV, VI) under the Court's diversity jurisdiction, 28 U.S.C. § 1332.[2]  Plaintiff alleges that UPM

(1) failed to provide reasonable requested accommodations for his disability; (2) terminated his

employment on account of his disability or perceived disability; and (3) retaliated against him

after he complained of disability discrimination by terminating his employment.  Plaintiff also

---

[1]Counsel for plaintiff filed a Suggestion of Death on October 17, 2011, suggesting on the record that plaintiff James Huggard died on October 3, 2011. (Doc. 51). The Court held a telephone status conference with counsel for the parties on November 2, 2011, at which time counsel for plaintiff represented to the Court that plaintiff's estate intends to proceed with this lawsuit, and both parties agreed that they do not object to this Report and Recommendation being issued. A motion to substitute the Estate of James Huggard c/o Maggie Hess, Executrix, was filed on November 14, 2011, and is pending before the Court. (Doc. 54).

[2]Plaintiff has elected not to oppose summary judgment on his age discrimination claims. *See* Doc. 44, p. 7 n.1.

alleges that UPM knowingly terminated him to avoid the vesting of certain employee benefits in violation of ERISA. As relief, plaintiff seeks lost earnings and benefits; compensatory damages; punitive damages; a permanent injunction to prevent defendant from engaging in any further unlawful behavior towards him; reinstatement; and attorney fees, costs, and interest.

This matter is before the Court on defendant UPM's Motion for Summary Judgment (Doc. 31), evidentiary submission in support of the motion (Doc. 32), and memorandum of law in support of the motion (Doc. 33); plaintiff's opposing memorandum and request for oral argument (Doc. 44); defendant's reply memorandum in support of the motion (Doc. 45); and plaintiff's surreply to defendant's reply (Doc. 48). Oral argument on the motion was held on September 29, 2011.

## I. Facts

Plaintiff began his employment with defendant's predecessor, Ferguson Metals, in May 2000 as Human Resources Director. Wayne Ferguson was Ferguson Metals' CEO; Annette Tiesman was Vice-President of Sales; and Pam McAlpin worked under plaintiff's supervision as Human Resources Generalist. In January of 2007, plaintiff was promoted to COO/Vice-President of Human Resources. Plaintiff's duties included overseeing employee benefits; Ferguson Metals' strategic planning process and safety program; education programs for employees through a state grant program; and operations, accounting, systems and information technology.

In March 2007, plaintiff was diagnosed with terminal stomach cancer. From March to September 2007, plaintiff underwent treatment for the cancer, including multiple surgeries. (Doc. 32, Exh. B, Plaintiff's Depo., pp. 61-62). Defendant claims that plaintiff was on medical

leave during this time period, although defendant has not submitted any records documenting this. Plaintiff disputes that he was on medical leave during this time frame and asserts that he continued to work from home and the hospital approximately four hours a day.[3] (*Id.*). Defendant does not deny that plaintiff was doing some work from home, such as answering emails. Defendant states that the only accommodation it provided plaintiff during the March to September 2007 time period was it secured a laptop for him.

In March 2007, Ferguson Metals merged with another entity, AIM, Inc., to form UPM. The effective date of the merger was January 2008. Tom Kennard became President of UPM but did not assume supervisory responsibility over UPM's employees until January 1, 2008. (Doc. 32, Exh. C, Kennard Depo., p. 27). Prior to that date and while plaintiff was undergoing cancer treatment, Kennard moved plaintiff to the position of Vice-President of Human Resources (HR) effective January 2008. Plaintiff's pay remained the same at $110,000 per year. Kennard promoted Annette Tiesman to the position of Executive Vice-President, although Tiesman's duties were in fact those of COO. (Doc. 32, Exh. E, Tiesman Depo., p. 23). Plaintiff claims his move was a demotion because he was relieved of his responsibilities for shipping and receiving and retained only HR duties. Defendant denies the move was a demotion and claims it was part of a cost-saving reorganization. Plaintiff contends that when he asked Kennard before he returned to work in September 2007 why he was no longer the COO, Kennard told plaintiff that he had worked with Tiesman and had become comfortable with her, and plaintiff was sick and Kennard had not gotten a chance to know him. (Doc. 32, Exh. B, Plaintiff's Depo., pp. 71-72).

There are some discrepancies in the record concerning the number of hours plaintiff

---

[3] Counsel stated at oral argument that he could not say how many hours plaintiff was working during this time period as there is no record of his hours.

3

worked in his role as UPM's Vice-President of Human Resources following his return to work on September 4, 2007 and continuing until May 2008. Plaintiff testified at his deposition that initially he worked four hours in the office and was available from home, but he worked full days from October 2007 until May 2008. (Doc. 32, Exh. B, Plaintiff's Depo., p. 64). At oral argument, counsel for plaintiff stated that plaintiff was working 20-24 hours per week at the office but there is evidence he was working additional hours at home. Plaintiff represented in his application for Social Security disability benefits that he was working 20-24 hours per week and he did not indicate he was working additional hours at home. (Doc. 31, p. 5, citing Doc. 32, Exh. G).

Beginning in February 2008, McAlpin assumed responsibility for ten of the essential duties and responsibilities of Vice-President of HR and plaintiff retained responsibility for six of the essential duties and responsibilities. (Doc. 32, Exh. B, Plaintiff's Depo., pp. 65-66; Depo. Exh. 4). After plaintiff's responsibilities were reduced, he informed Kennard several times that he could continue to work with the reasonable accommodations of working from home and working different hours, but Kennard refused to respond to his requests. (*Id.*, pp. 68-77). UPM denies that plaintiff asked for an accommodation but claims it nonetheless accommodated plaintiff during the September 2007 to May 2008 time period by allowing him to work part-time while paying him his full-time salary and allowing him to be off work when he could not come into the office.

Plaintiff stopped coming to work in May 2008. UPM alleges that plaintiff stopped working because he was "unable to maintain [the] focus required to produce quality work" and "the chronic fatigue caused by the treatments for [his] disease [] robbed [him] of the required

4

energy to work" as plaintiff represented on the Social Security disability benefits application which he later filed.[4] (Doc. 33, p. 5, citing Doc. 32, Exh. G). Plaintiff alleges that in late May or early June 2008, he asked Kennard for accommodations which would allow him to continue to work, but Kennard refused to discuss any accommodations with him and instead asked him about his medical condition and his medical bills. (Doc. 32, Exh. B, Plaintiff's Depo., pp. 51-52). Three weeks later, in June of 2008, UPM submitted a written proposal to plaintiff whereby plaintiff would agree that he was no longer in a position to fulfill his job duties; he would immediately apply for short term disability (STD); upon approval of the application he would relinquish his full-time position as Vice-President of HR and move to an advisory role, at which time his regular compensation would cease but all other employee benefits would remain in effect for the duration of STD; he would be paid a one-time bonus of $50,000 upon approval of STD; and prior to the completion of STD, he would either apply for long term disability (LTD) or return to work. (Doc. 32, Exh. B, Depo. Exh. 8). However, plaintiff declined the proposal and Kennard rescinded the offer shortly thereafter.

Kennard, McAlpin, Tiesman and Jeffrey Liesch, UPM's CFO, met with plaintiff on October 27, 2008. Kennard brought with him to the meeting a letter which had been prepared prior to the meeting informing plaintiff that it was UPM's intention to eliminate his position effective the date of his termination from the company; UPM would honor plaintiff's current employment agreement through its defined termination date of December 31, 2008; if plaintiff applied for STD benefits under the company's plan and was approved for coverage under the

---

[4]UPM also suggests that plaintiff stopped coming to work in May 2008 because he was upset about the firing of another employee, but the evidence UPM cites does not support a finding that plaintiff stopped coming to work for this reason. (See Doc. 33 at 5, citing Doc. 32, Exh. B, Plaintiff's Depo. at 51; Doc. 32, Exh. F, McAlpin Depo. at 56; Exh. A, Kennard Aff. at ¶ 5).

5

plan, his position would not be eliminated until his eligibility for STD benefits had concluded; and if plaintiff chose not to apply for STD benefits, his employment would conclude with the expiration of his employment agreement on December 31, 2008. (*Id*., Depo. Exh. 9). During the meeting, but before Kennard gave plaintiff the letter, plaintiff complained that UPM was discriminating against him because of his disability. After he complained, Kennard and Liesch conferred outside of plaintiff's presence and discussed that plaintiff had just threatened UPM with a lawsuit. (Doc. 32, Exh. D, Liesch Depo., pp. 71-72). They determined they did not need to consult an attorney because they had already done so, and they decided to proceed to give plaintiff the letter of termination. *Id*.

Plaintiff subsequently completed a short term disability application. (Doc. 32, Exh. B, Depo. Exh. 11). He stated in the application that he was unable to perform the duties of his job due to "PMP [Pseudomyxoma Peritonei cancer], currently on chemo, chronic fatigue, pain, ascites. The cancer is metastatic." (*Id*.). Plaintiff's attending physician stated on the application that plaintiff's disability began on May 1, 2008, and he listed the expected return to work date as "Not Expected." (*Id*.). In response to the question, "Is patient able to work with job modifications or restrictions?" the physician wrote, "Not able to work." (*Id*.). Plaintiff was approved for STD benefits. Plaintiff was paid his full salary until December 31, 2008, the date of his termination and the end date of his employment contract. Beginning January 1, 2009, Pam McAlpin, who is not disabled, assumed the HR administrative duties.

Plaintiff completed an application for LTD on December 10, 2008. (Doc. 32, Exh. B, Depo. Exh. 12). Plaintiff stated that he was unable to work because of fatigue, abdominal pain, nausea, diarrhea and neuropathy. Plaintiff reported that the last day he worked before his

6

disability was April 30, 2008, and he worked four hours; the date he was first unable to work on a full-time basis was May 1, 2008; and he did not expect to return to work. Plaintiff's physician wrote on the application that plaintiff had reached maximum medical improvement and plaintiff was not able to return to work.

Plaintiff completed an application for Social Security disability insurance benefits (SSDI) in which he stated that he stopped working on May 1, 2008, because he was "[u]nable to maintain the focus required to produce quality work" and "the chronic fatigue caused by the treatments have robbed me of the required energy to work." (Doc. 32, Exh. G). The Social Security Administration determined that plaintiff became disabled under its rules on February 26, 2007, and awarded him benefits beginning November 7, 2007, 12 months preceding the month of his filing. (Doc. 32, Exh. B, Depo. Exh. 14).

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on June 5, 2009. (Doc. 32, Exh. B, Depo. Exh. 15).

## II. Summary Judgment Standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. The court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). The evidence of

the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)). However, a district court need not view the facts in the light most favorable to the nonmoving party if that party's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* (citing *Cities Serv.*, 391 U.S. at 288-289). If the evidence is merely colorable, *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.*, 391 U.S. at 290, judgment may be granted. *Anderson*, 477 U.S. at 249.

## III. Motion for Summary Judgment

Defendant UPM moves for summary judgment on plaintiff's ADA claim on the ground he failed to timely exhaust his administrative remedies with the EEOC as required under 42 U.S.C. § 12117. Defendant moves for summary judgment on both the federal and state disability discrimination claims on the grounds that (1) plaintiff cannot establish a prima facie case of discrimination on the basis of his disability because representations plaintiff and his physician made in his applications for disability benefits preclude plaintiff from establishing that he was a qualified individual with a disability, and (2) plaintiff cannot establish that the reason for his discharge was pretextual. Defendant argues it is entitled to summary judgment on plaintiff's retaliation claim because plaintiff cannot establish the prima facie elements of retaliation or show that UPM's legitimate, nondiscriminatory reason for the elimination of his position was a pretext

8

for retaliation. Finally, defendant asserts that plaintiff cannot establish his ERISA claim because he cannot show that UPM terminated his employment in order to avoid paying benefits to him.

## A. Disability Discrimination

### 1. Applicable law

The ADA prohibits an employer from discriminating against a "qualified individual" on the basis of a disability. 42 U.S.C. § 12112(a);[5] *McKay v. Toyota Motor Mfg., U.S.A., Inc.*, 110 F.3d 369, 371 (6th Cir. 1997). Ohio Rev. Code § 4112.02 makes it an unlawful discriminatory practice "[f]or any employer, because of the . . . disability . . . of any person, to discharge without just cause . . . or otherwise to discriminate against that person . . . ." The analysis of a claim under the ADA and § 4112.02 is essentially the same, *see Kleiber v. Honda of America Mfg., Inc.,* 485 F.3d 862, 872 (6th Cir. 2007), and the case law regarding claims brought under the ADA is generally applicable to claims brought under the Ohio statute.[6] *See Wooten v. Columbus, Div. of Water,* 632 N.E.2d 605, 610 (Ohio App. 10 Dist. 1993).

A "qualified individual" with a disability is an individual who "satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). The federal regulations define

---

[5]Although the ADA was amended by the ADA Amendments Act of 2008, which took effect on January 1, 2009, Pub.L. No. 110-325, 122 Stat. 3553, the Act is not relevant to plaintiff's claims because it does not apply retroactively to conduct occurring before the Act became effective. *See Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 565 (6th Cir. 2009).

[6]As noted by this Court in *Seil v. Keystone Automotive, Inc.*, 678 F. Supp.2d 643, 648 n.2 (S.D. Ohio 2010) (Beckwith, J.), the analysis differs in one key respect: To establish a disability discrimination claim under the ADA, the plaintiff must show that the employer discriminated against him *solely* because of his disability (*Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 363 & 363 n. 2 (6th Cir. 2007)), whereas Ohio law requires the plaintiff to show that his disability played at least a part in the employer's adverse employment decision. *Columbus Civil Serv. Comm'n v. McClone*, 697 N.E.2d 204, 206 (Ohio 1998).

"essential functions" as the fundamental job duties of the employment position. 29 C.F.R. § 1630.2(n)(1). Whether a particular function is essential is a factual determination which must be made on a case-by-case basis. *Hoskins v. Oakland County Sheriff's Department,* 227 F.3d 719, 726 (6th Cir. 2000) (citations omitted). An employer is permitted to exercise its business judgment in establishing performance standards and in determining whether an individual can meet its standards, "whether qualitative or quantitative." 29 C.F.R. Pt. 1630, Appendix to § 1630.2(n).

If the plaintiff has direct evidence that the employer relied on his alleged disability in making an adverse employment decision, or if the employer admits that it relied on plaintiff's alleged disability in making such decision, the plaintiff bears the burden of showing that (1) he has a disability, and (2) he is "otherwise qualified" for the position despite his disability either (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. *Hoskins,* 227 F.3d at 724 (citing *Hamlin v. Charter Township of Flint,* 165 F.3d 426, 429 (6th Cir. 1999) (quoting *Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1186 (6th Cir. 1996)). The employer then bears "the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer." *Id.* (citing *Monette,* 90 F.3d at 1186).

If plaintiff seeks to establish his case indirectly without direct proof of discrimination, he may establish a prima facie case of discrimination by showing that: "1) [he] is disabled; 2) [he is] otherwise qualified for the position, with or without reasonable accommodation; 3) [he] suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's

10

disability; and 5) . . . the disabled individual was replaced." *Whitfield v. Tenn.,* 639 F.3d 253,

258-59 (6th Cir. 2011) (citing *Macy,* 484 F.3d at 365) (quoting *Monette,* 90 F.3d at 1186). The

employer must then offer a legitimate, non-discriminatory reason for its action. *Id.* at 260. If the

employer does so, plaintiff must introduce evidence showing that the proffered reason is

pretextual. *Id.*

An individual is considered "disabled" under the ADA if he:

(A) [has] a physical or mental impairment that substantially limits one or more
major life activities of such individual;
(B) [has] a record of such impairment; or
(C) [is] regarded as having such an impairment.

42 U.S.C. § 12102(2).

Discriminating against an individual with a disability includes "not making reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual

with a disability who is an applicant or employee, unless such covered entity can demonstrate

that the accommodation would impose an undue hardship on the operation of the business of

such covered entity . . . ." 42 U.S.C. § 12112(b)(5)(A). To establish a failure to accommodate

claim, the plaintiff must show (1) he has a disability; (2) he is otherwise qualified for the job; and

(3) the employer refused to make a reasonable accommodation for his disability. *Denczak v.

Ford Motor Co.,* 215 F. App'x 442, 444 (6th Cir. 2007) (citing *Smith v. Ameritech,* 129 F.3d 857,

866 (6th Cir. 1997)).

Where the plaintiff claims that he would be qualified to perform the essential functions of

the job with a reasonable accommodation, the plaintiff has the initial burden of proposing an

accommodation and proving that it is objectively reasonable. *Monette,* 90 F.3d at 1183.

Reasonable accommodations may include making existing facilities used by employees readily

11

accessible to and usable by individuals with disabilities; job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modification of equipment or devices; and appropriate adjustment or modifications of examinations, training materials or policies. 42 U.S.C. § 12111(9).

An employer bears the burden of proving that a particular job requirement is necessary when the plaintiff challenges a job function as non-essential. *Monette*, 90 F.3d at 1184. However, the disabled individual always retains the burden of proving that he is "otherwise qualified" for the position in question, absent the challenged job function or with the proposed accommodation. *Id*. As the Sixth Circuit in *Monette* explained:

> [N]othing in the statute alters the burden the disabled individual bears of
> establishing that he or she is capable of performing the essential functions of the
> job with the proposed accommodation. Put simply, if the employer claims that a
> proposed accommodation will impose an undue hardship, the employer must
> prove that fact. If the employer claims instead that the disabled individual would
> be unqualified to perform the essential functions of the job even with the proposed
> accommodation, the disabled individual must prove that he or she would in fact
> be qualified for the job if the employer were to adopt the proposed
> accommodation.

*Id*. at 1183-84.

### 2. Timeliness of Filing

UPM argues that plaintiff failed to exhaust his ADA demotion and termination claims by failing to timely file a charge of discrimination with the EEOC. (Doc. 33 at 17-19). Under the administrative scheme, the plaintiff must file an EEOC charge within 180 days of the alleged unlawful employment practice or, if the plaintiff has initially instituted proceedings with a state or local agency, within 300 days of the alleged unlawful employment practice. *See* 42 U.S.C. § 2000e-5(e)(1). UPM contends that plaintiff had only 180 days to file his EEOC charge because

he did not initially file his charge with the State agency. *See Berger v. Medina County Ohio Bd. of County Comm'rs*, 295 F. App'x 42 (6th Cir. 2008). However, as plaintiff correctly notes, this Court has determined that because Ohio is a deferral jurisdiction, a plaintiff has 300 days to file a discrimination charge with the EEOC as a matter of law. *See Winkelmann v. Big Lots Stores, Inc.*, No. 1:08-cv-00419, 2009 WL 3788673, at \*6 and n.1 (S.D. Ohio Nov. 10, 2009) (Spiegel, J.) (distinguishing *Berger*, where the appeals court affirmed dismissal of the complaint based on the plaintiff's failure to allege the existence of a work agreement between the Ohio Civil Rights Commission and the EEOC, as not being on point because the plaintiff before the Court raised the argument that Ohio is a deferral state and the 300-day limitations period applied).

Plaintiff clarified at the oral hearing that he does not seek to bring an ADA claim based on his alleged demotion in September 2007, but instead he offers that job action into evidence for the sole purpose of shedding light on defendant's motives in connection with his remaining claims. Thus, the only question is whether plaintiff's unlawful termination claim is barred due to plaintiff's alleged failure to timely file an EEOC charge. Plaintiff was notified of his termination on October 27, 2008. He filed his EEOC charge on June 5, 2009. (Doc. 32, Exh. B, Depo. Exh. 15). This was within 300 days of the termination notification. Plaintiff's unlawful termination charge was therefore timely filed and plaintiff may proceed on that claim.

### 3. Resolution

As a threshold matter, the Court must determine whether this case involves direct or indirect evidence of discrimination in order to determine the appropriate analytical framework. *See Monette*, 90 F.3d at 1185. If plaintiff has direct evidence of discrimination based on his disability, there is no need to apply the *McDonnell Douglas* burden-shifting analysis and

13

traditional burdens of proof will apply. *Id*.

Plaintiff contends both that UPM terminated his employment because of his disability and that UPM failed to accommodate his disability after May 1, 2008. Defendant claims it decided in October 2008 to terminate plaintiff's employment because it concluded it did not need an executive level HR position as Pam McAlpin was performing most of the local HR functions and UPM's parent company was handling benefits and providing support on more complex HR issues. (Doc. 33 at 2). Defendant characterizes its decision as a cost-saving measure but ties the decision to eliminate the position directly to plaintiff's disability. Kennard testified that eliminating plaintiff's position felt like the natural thing to do because plaintiff had not worked in the position for a long time, a situation which defendant knew was directly attributable to plaintiff's disability. (Doc. 32, Exh. C, Kennard Depo., p. 137). Shawn Smith, the Vice-President of HR, testified at his deposition that UPM knew plaintiff's absence from work was attributable to his illness, and concern about plaintiff's ability to return to work factored into the decision to terminate plaintiff's employment. (Doc. 41, Smith Depo., pp. 21-22). Moreover, defendant contends that plaintiff stopped coming to work in May 2008, after being allowed to work remotely from home since March 2007, because his cancer and the side effects from his treatment rendered him unable to work. (Doc. 33 at 5, 9, citing Plaintiff's Depo., pp. 61-64).[7] In addition, it is undisputed that Kennard gave plaintiff an ultimatum in May or June of 2008 that he needed to return to work and be in the office every day on a full-time basis without restrictions or

---

[7]Plaintiff's deposition testimony concerning the number of hours he was working at the office during this period of time is not entirely clear. Plaintiff's testimony suggests he was working full days from October 2007 or some other point following his return to work until May 2008. (Doc. 32, Exh. B, Plaintiff's Depo., p. 64). However, plaintiff's Social Security disability application states that he was working "only 20-24 hours per week" after his return to work in September of 2007 through April of 2008 due to his health. (Doc. 32, Exh. G at 7).

14

go on disability. (Doc. 32, Exh. C, Kennard Depo., pp. 95-99, 113-115, 134-135). Finally, counsel for defendant conceded at oral argument that UPM was concerned about plaintiff's absence from work.

Thus, the evidence establishes that the decision to eliminate plaintiff's position was admittedly based upon plaintiff's absence from work due to his disability. This constitutes direct evidence that defendant terminated plaintiff based on his disability. *See Coulson v. The Goodyear Tire & Rubber Co.,* 31 F. App'x 851, 855 (6th Cir. 2002) (citing *Hamlin v. Charter Twp. of Flint*, 165 F.3d 426, 429-30 (6th Cir. 1999)) (an admission by the employer that it discharged an employee based on his inability to perform a job function, when that inability is caused by a disability, is direct evidence of discharge based on the disability). Where, as here, there is direct evidence of discrimination, "the determinative disputed issue in the case will not be the employer's 'intent,' but instead in most cases will be whether the employee is 'otherwise qualified,' with or without reasonable accommodation, to perform the job, a factual dispute capable of resolution through traditional methods of proof." *Monette*, 90 F.3d at 1182. Therefore, the "direct evidence" analytical framework, and not the *McDonnell Douglas* burden-shifting analysis, is the appropriate framework for analyzing plaintiff's disability discrimination claim. *See Monette*, 90 F.3d at 1178, 1180.

The procedure to be followed for establishing plaintiff's unlawful termination claim is that outlined in *Monette*, 90 F.3d at 1186: (1) plaintiff has the burden of establishing he was disabled; (2) plaintiff has the burden of establishing he was otherwise qualified for his position despite his disability (a) without accommodation from UPM or (b) with an alleged "essential" job requirement eliminated or (c) with a proposed reasonable accommodation; and (3) UPM

15

bears the burden of proving that a challenged job criterion is essential and therefore a business necessity, or that a proposed accommodation would impose an undue hardship on it. To establish his failure to accommodate claim, plaintiff must establish that (1) he has a disability; (2) he is otherwise qualified for the job; and (3) UPM refused to make a reasonable accommodation for his disability. *See Denczak*, 215 F. App'x at 444.

It is undisputed that plaintiff was disabled. Thus, plaintiff satisfies the first prong of his unlawful termination and failure to accommodate claims.

The parties dispute whether plaintiff meets the second prong of his disability discrimination claims: whether plaintiff was otherwise qualified for his position despite his disability. Defendant UPM contends that plaintiff cannot satisfy his burden of showing that he was a "qualified individual with a disability" because plaintiff and his physician made repeated assertions in plaintiff's applications for disability benefits that he was unable to work as of May 2008 and was not expected to be able to return to work.

Plaintiff asserts that UPM's reliance on his disability applications for its argument that he was not qualified under the anti-discrimination statutes for his position is misplaced. Plaintiff contends that in making its argument, UPM ignores the fact that he was able to work with an accommodation between March and October 2007 and at the office between October 2007 and May 2008, when UPM allowed him to work from home intermittently when necessary. (*See* Doc. 32, Exh. B, Plaintiff's Depo., p. 64). Thus, plaintiff claims there is no question he was a qualified individual with a disability prior to May 2008. Plaintiff further argues there is insufficient evidence to show he could not perform the essential functions of his job with an accommodation between May 2008 and the date of his termination on December 31, 2008.

16

Plaintiff also notes that he was undergoing chemotherapy during the period covering his claim for STD, and a jury could conclude this treatment might preclude work for that period of time but not indefinitely. (Doc. 44 at 21-22). Plaintiff concludes that he made it clear to UPM in May 2008 that he could continue working. (*Id.* at 22).

In reply, UPM contends that plaintiff has not explained the inconsistency between his applications for disability benefits and his disability claims presented in this lawsuit. UPM contends that plaintiff's representations he was unable to return to work negate any possibility than his inability to return to work was temporary. Moreover, UPM contends that plaintiff's statements in his application for Social Security disability benefits demonstrate that plaintiff, by his own admission, was unable to perform the essential functions of the job as he described them. (*See* Doc. 32, Exh. G).

The United States Supreme Court has determined that where the Social Security Administration has found a plaintiff to be disabled as of or before his discharge date under its standards (the disability is so severe the claimant is unable to do his previous work or any other substantial gainful work), there exists an apparent inconsistency with the plaintiff's claim under the ADA (which prohibits covered employers from discriminating against a disabled person who can perform the essential functions of his job, including those who can do so only with reasonable accommodation). *Cleveland v. Policy Mgmt. Systems Corp.*, 526 U.S. 795 (1999). Nonetheless, the pursuit and receipt of Social Security disability benefits does not automatically estop a recipient from pursuing an ADA claim, and neither "does the law erect a strong presumption against the recipient's success under the ADA." *Id.* at 797-98. While there may be an appearance of a conflict between a claim for disability benefits and a claim under the ADA,

17

there are situations where an individual may qualify for disability benefits and yet be capable of performing the essential functions of his job due to special circumstances. *Id*. at 802-804.

However, where there has been a disability determination, the ADA claimant must provide a sufficient explanation for any apparent contradiction that arises out of the earlier total disability claim and the ADA claim. *Id*. at 806. As the Supreme Court explained in *Cleveland*:

> An ADA plaintiff bears the burden of proving that she is a "qualified individual with a disability"-that is, a person "who, with or without reasonable accommodation, can perform the essential functions" of her job. And a plaintiff's sworn assertion in an application for disability benefits that she is, for example, "unable to work" will appear to negate an essential element of her ADA case-at least if she does not offer a sufficient explanation. For that reason we hold that an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the SSDI total disability claim. Rather, she must proffer a sufficient explanation.

> [A] party cannot create a genuine issue of material fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity. When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

*Cleveland*, 526 U.S. at 806-807 (internal citations omitted). *See also Williams v. London Utility Com'n*, 375 F.3d 424, 429 (6th Cir. 2004).[8]

In *Kiely v. Heartland Rehabilitation Services, Inc.*, 359 F.3d 386 (6th Cir. 2004), the Sixth Circuit determined that an employee's receipt of Social Security disability benefits was not

---

[8]Ohio courts have applied the decision in *Cleveland* to claims brought under the Ohio anti-discrimination statute. *See, e.g., Crosier v. Quikey Mfg. Co., Inc.*, No. 19863, 2001 WL 196511, at \*6 (Ohio App. 9 Dist. 2001) (the plaintiff had the burden to show worker's compensation and Ohio disability discrimination claims were consistent); *Smith v. Dillard Dept. Stores, Inc.*, 744 N.E.2d 1198, 1206 (Ohio App. 8 Dist. 2000) (same).

necessarily inconsistent with his disability discrimination claim requiring the plaintiff to show he was capable of performing the essential functions of his job. The Court of Appeals noted that "disability" as defined by the Social Security Act did not take into consideration the possibility of an accommodation enabling the claimant to perform the duties of his job. "[T]hus, a plaintiff could be disabled under the SSA and still be qualified to perform the duties of his job . . . with reasonable accommodation." *Id.* at 389 (internal quotation and citation omitted). The plaintiff in *Kiely* was found eligible for SSDI based on "statutory blindness," a finding under the Social Security listings that extended benefits automatically to people with specified conditions. The plaintiff did not represent he was unable to work and "[a] reasonable juror could easily find . . . that his legal blindness was the basis on which Mr. Kiely expected to receive benefits" and not on the basis that "he was actually unable to work." *Id.* at 390. The Sixth Circuit also noted that when examining a disability application for "admissions" by the plaintiff, the Court must consider the context in which the statements were made and whether the application form was merely a "check-the-box" form or allowed for elaboration of the claim. *Id.* (citing *Griffith v. Wal-Mart Stores, Inc.,* 135 F.3d 376, 382 (6th Cir. 1998)). A court should consider whether the employee had "a fair opportunity to accurately explain the details of the employee's medical condition and his ability or inability to work for purposes of [disability discrimination laws]." *Id.* (citing *Griffith,* 135 F.3d at 382).

Similarly, in *Parker v. Columbia Pictures Industries*, 204 F.3d 326 (2d Cir. 2000), the Court determined that although the plaintiff's statements on his applications for LTD and Social Security disability benefits facially conflicted with his affidavit presented to the district court, the statements did not, as a matter of law, preclude the plaintiff from showing that he could perform

the essential functions of his job with reasonable accommodation in accordance with the ADA. In his LTD application, the plaintiff stated that he was unable to work because he was "completely incapacitated-disabled-treatment daily." *Id*. at 334. The Court determined that the plaintiff's statements did not constitute "directly conflicting statements about purely factual matters" such that they "could not be reconciled with any amount of explanation." *Id*. (citing *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 7-9 (2d Cir. 1999). In his Social Security disability benefits application, the plaintiff stated that he became unable to work because he had problems sitting, standing and walking for sustained periods; he had constant pain; and he had problems in his legs. *Id*. The Court found that if the disability applications were read in context, a reasonable juror could find the plaintiff was nonetheless capable of performing the essential functions of his job with a reasonable accommodation, including part-time employment. *Id*. The Court noted that the Social Security application form asked only why he was unable to continue working generally, and a reasonable jury could find that the plaintiff's statements to the Social Security Administration constituted an explanation for his termination rather than a description of his actual physical abilities given that the defendant employer had informed plaintiff he was being terminated upon expiration of his disability leave. *Id*.

In contrast, the Second Circuit Court of Appeals in *Mitchell*, 190 F.3d at 7, found that the plaintiff was estopped from claiming he could perform the essential functions of his head custodian position with reasonable accommodation by his prior factual assertions that he was incapable of standing for any length of time or of walking, and that he required work he could perform in a seated position. The Court determined that the plaintiff had offered "purely factual" statements which directly contradicted one another and could not be reconciled by any amount of

explanation. *Id.*

In this case, plaintiff's statements in his disability applications are not "purely factual" statements which cannot be reconciled with his representations in this litigation. To the contrary, in the disability applications, plaintiff made only general representations about his inability to work on a full-time basis and did not represent that he was unable to perform specific job duties. In his Social Security disability benefits application, plaintiff described his job duties as follows:

> Oversee the daily operation of Human Resources, Corporate Policies & Strategy, Safety, and Trustee of Company Retirement Plan[.] These responsibilities required me to communicate effectively and clearly concerning numerous issues within in [sic] each area. In addition, the decision making ability required that I be able to collect and review corporate operational data in a [sic] to assist in making correct decisions. The majority of my duties require that I set up and attend meetings, discuss problem issues and determine the correct [sic] which demands I be alert, aware, focused which required that I be energitic [sic] at all times. Used computer as main work tool.

(Doc. 32, Exh. G). Unlike the plaintiff in *Mitchell*, 190 F.3d at 7, plaintiff's disability application did not identify any essential function of the VP of Human Resources position which he could no longer perform. Rather, plaintiff generally represented that he no longer had the focus or energy necessary to perform the job duties required of him as of May 1, 2008, the date defendant told him to not come back to work. In response to the Social Security Administration's question, "Why did you stop working?" plaintiff responded:

> Because of my condition[.] Unable to maintain the focus required to produce quality work. In addition, the chronic fatigue caused by the treatments for my disease have robbed me of the required energy to work[.]

(Doc. 32, Exh. G).

Similarly, plaintiff and his attending physician made only general representations about the disabling effect of plaintiff's condition in his short term and long term disability applications,

both of which were approved. (Doc. 32, Exh. B, Depo. Exhs. 11, 12). Plaintiff's attending physician completed a portion of the STD form on November 21, 2008. (Doc. 32, Exh. B, Depo. Exh. 11.). He reported that plaintiff's disability began on May 1, 2008, and that plaintiff was not expected to return to work. (*Id.*). When asked whether plaintiff was able to work with job modifications or restrictions, the attending physician simply wrote, "Not able to work." (*Id.*). Plaintiff's attending physician likewise represented on plaintiff's LTD application, which he completed on December 15, 2008, that plaintiff had reached maximum medical improvement and was not able to return to work. (*Id.*, Exh. 12). Plaintiff reported on the application that he was first unable to work on a full-time basis on May 1, 2008; he had last worked on April 30, 2008, and he had worked only four hours that day; and he did not expect to return to work. (*Id.*). In neither of these applications did plaintiff or his physician identify specific functions of his position which plaintiff was unable to perform. Accordingly, plaintiff's statements in his disability applications do not compel the factual conclusion that he was incapable of working on either a reduced schedule or with the accommodation of working from home when necessary.

Moreover, plaintiff has adequately explained the apparent discrepancy between his statements in his applications for disability benefits and the representations he has made in support of his disability discrimination claims. *Cleveland,* 526 U.S. at 806-807. Plaintiff alleges in support of these claims that he "made it clear that he could continue working" when he objected to UPM's "decision to force him to leave in May 2008." (Doc. 44 at 22, citing Plaintiff's Depo., pp. 46, 51, 70). Plaintiff indicates that the disabling effects of the

chemotherapy he underwent beginning in June 2008 were only short-term and he could have continued working past May 1, 2008, the date he stated in his disability application he could no longer work, had UPM provided him the accommodations it had given him prior to that date. (Doc. 48 at 1-2). He identifies the accommodations he required as working at home or working flexible hours. (Doc. 44 at 21-22). Plaintiff testified at his deposition that he informed Kennard in September 2007 and again some time in 2008 that he was able to work "[w]ith an accommodation" and that he discussed the accommodations of working from home or working different hours with Kennard in September 2008. (Doc. 32, Plaintiff's Depo., Exh. B, pp. 68-70, 75-77). Assuming for summary judgment purposes that defendant could have reasonably accommodated plaintiff in the manner he requested, plaintiff's statements in his disability applications do not factually contradict plaintiff's claim that he could have performed the essential duties of his position with these or some other accommodations beyond May 1, 2008, the date his disability allegedly began. Nothing in the applications forecloses plaintiff from establishing that he would have had the energy and focus necessary to perform his job had he been given the accommodations of reduced hours or the flexibility to work at home.

Finally, the Court notes that it was only after UPM allegedly denied plaintiff an accommodation and forced him to apply for short term disability benefits, thus leading to the termination of plaintiff's employment contract, that plaintiff sought and was awarded Social Security disability benefits. A reasonable juror could infer from these circumstances that plaintiff did not believe he was unable to continue working, despite his pursuit of disability benefits. *See Parker*, 204 F.3d at 335.

Plaintiff has provided an explanation which is sufficient to warrant a reasonable juror in

finding that, despite his statements in his Social Security, short term, and long term disability applications that he was unable to work, he could nonetheless perform the essential functions of his job, with or without reasonable accommodation. *See Cleveland*, 526 U.S. at 807; *see also Griffith*, 135 F.3d at 383. Because the record shows there is a genuine issue of material fact as to whether plaintiff could have performed the essential functions of his position with or without a reasonable accommodation as of the date of his termination, plaintiff may be able to establish that he was a qualified individual with a disability within the meaning of the anti-discrimination statutes.

Defendant argues that plaintiff cannot establish a claim for failure to accommodate because an employer is not required to give an employee an indefinite leave of absence when the employee cannot provide the expected duration of his impairment, *see Harris v. Circuit Court*, 21 F. App'x 431, 432 (6th Cir. 2001), or to keep an employee on unpaid leave until the employee is able to return to work. *See Monette*, 90 F.3d at 1188 (plaintiff failed to create a genuine issue of material fact regarding the defendant's explanation that keeping the plaintiff's position open while he was on open-ended disability leave would impose an undue hardship). Defendant further argues that it did provide plaintiff with the reasonable accommodations of allowing him extended leave and the option to work remotely from home as he pleased from March 2007 until at least May 2008.

While defendant is correct in asserting that an employer is not required to give an employee an indefinite leave of absence, it is not clear from the record that this was the situation UPM faced with plaintiff. To the contrary, according to plaintiff, he was working full days at the time UPM told him to stop coming to work in May 2008. (Doc. 32, Exh. B, Plaintiff's Depo., p.

24

64).

Finally, there are genuine issues of material fact on the third prong of plaintiff's unlawful termination and failure to accommodate claims which preclude summary judgment in defendant's favor, including whether defendant could have reasonably accommodated plaintiff, whether any requested accommodations would have imposed an undue hardship on defendant, and whether defendant refused to make a reasonable accommodation for plaintiff's disability. Additionally, there are genuine disputes on how many hours plaintiff was working each week between October 2007 and May 2008; whether plaintiff requested an accommodation from defendant and, if so, the date of any such requests; and the type of accommodations plaintiff requested. Accordingly, defendant should not be granted summary judgment on plaintiff's disability discrimination claims.

## B. Retaliation Claim

Plaintiff claims that UPM violated Ohio Rev. Code Ch. 4112 by retaliating against him after he threatened the company with a lawsuit for disability discrimination. A retaliation claim under Chapter 4112 mirrors a retaliation action brought under Title VII and is therefore governed by the same standards. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 541 (6th Cir. 2003) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128 (Ohio 1981)). To prove a claim of retaliation, plaintiff must demonstrate that (1) he engaged in protected activity; (2) the exercise of his civil rights was known by defendant; (3) defendant thereafter took an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action. *Mack v. B.F. Goodrich Co.*, 699 N.E.2d 97, 100 (Ohio App. 8 Dist. 1997) (citing *Rudy v. Loral Defense Sys.*, 619 N.E.2d 449

(Ohio App. 9 Dist. 1993)). Once the plaintiff establishes a prima facie case of retaliation, the burden is on the defendant to articulate a legitimate reason for the adverse action, which plaintiff may rebut by producing credible evidence of pretext. *Thatcher v. Goodwill Indus. of Akron,* 690 N.E.2d 1320, 1327 (Ohio App. 9 Dist. 1997) (citing *Chandler v. Empire Chem., Inc., Midwest Rubber Custom Mixing Div.*, 650 N.E.2d 950, 954 (Ohio App. 9 Dist. 1994)).

Plaintiff asserts that he has established a prima facie case of retaliation because it is undisputed that (1) he engaged in protected activity by threatening to bring a lawsuit under the ADA against UPM at the October 28, 2008 meeting with Liesch, Kennard, McAlpin and Tiesman; (2) UPM was aware of this threat; (3) UPM took an adverse employment action by terminating him; and (4) a jury could conclude that UPM would not have taken the adverse action against him had he not threatened a lawsuit. To establish his case, plaintiff relies on the testimony of Liesch that when plaintiff threatened to sue UPM, Liesch and Kennard stepped into the hallway to discuss plaintiff's threat before returning to the meeting and handing him a termination letter. (Doc. 32, Exh. D, Liesch Depo., pp. 71-72). Plaintiff argues that the facts do not show one way or the other that the decision to terminate him was made prior to his threatening the lawsuit. (Doc. 44 at 31).

Defendant argues that plaintiff cannot establish a prima facie case of retaliation because plaintiff must show he engaged in protected activity before the adverse employment decision was made. (Doc. 45 at 12). Defendant contends that plaintiff is unable to establish the fourth prong of a prima facie case of retaliation because the decision to terminate his employment was made prior to the October 27, 2008 meeting. (Doc. 45 at 12, citing Doc. 32, Exh. C, Kennard Depo. at 136-138; Kennard Aff., ¶ 8).

"To establish the causal connection that the fourth prong requires, the plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Abbott*, 348 F.3d at 543 (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (holding that a plaintiff need only present evidence "sufficient to raise the inference that her protected activity was the likely reason for the adverse action" to establish the causation element)). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen*, 229 F.3d at 563. *See also Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) ("The burden of proof at the prima facie stage is minimal.").

To establish a causal connection between plaintiff's protected conduct (threatening a lawsuit under the ADA) and defendant's adverse employment action (terminating plaintiff's employment), plaintiff may rely on the temporal proximity between the two. *See, e.g., Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (finding that three months between plaintiff's request for leave and termination satisfies the prima facie case of retaliation). "Although temporal proximity alone will not support an inference in the face of compelling evidence to the contrary, the proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection." *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554-55 (6th Cir. 2002) (internal citations omitted). The close temporal proximity between plaintiff's threat of a lawsuit and the final decision to terminate his employment supports an inference of a causal connection between his protected activity and the adverse employment action taken against him. When viewed in a light most favorable to plaintiff, plaintiff has

presented sufficient evidence from which a reasonable jury could find that a causal connection exists between plaintiff's complaints of discriminatory treatment and his termination.

While defendant contends the decision to terminate plaintiff was made before the October 2008 meeting and argues that plaintiff's threat of a lawsuit had no impact on defendant's decision to terminate his employment, the evidence shows that the decision to terminate plaintiff was not final until after Liesch and Kennard met in the hallway after plaintiff threatened a lawsuit. Liesch testified that the ultimate decision to terminate or not terminate plaintiff was one for Kennard as the president of the company and that Kennard continued to have the authority to rescind, change or alter the tentative decision during the conference. (Doc. 32, Exh. D, Liesch Depo., pp. 67-68). Liesch testified that the reason he and Kennard stepped out of the meeting to confer was for the purpose of reassessing the company's position. (*Id.* at 68-69). One can draw from the fact that Liesch and Kennard stepped out of the meeting to confer for the purpose of reassessing the company's position-after plaintiff had raised his concerns about disability discrimination-a reasonable inference that the decision to terminate plaintiff was not a foregone conclusion which was set in stone. In fact, counsel for defendant acknowledged at the oral hearing that Kennard had the authority to decide not to terminate plaintiff at that point. Given the evidence that defendant's final decision to go through with the termination was made moments after plaintiff threatened suit, plaintiff has presented sufficient evidence to establish the fourth prong of his prima facie case of retaliation. Although defendant argues that the decision to terminate plaintiff's employment was already made prior to the October 2008 meeting, this is a question of fact which is disputed. Therefore, plaintiff has established a prima facie case of retaliatory discharge.

28

Defendant argues that plaintiff nonetheless cannot overcome its legitimate, non-discriminatory reason for the elimination of his position. Defendant asserts that it eliminated plaintiff's position because the 2008 economic recession significantly impacted its business and it had concluded by October 2008 that it did not need an executive level human resources position. However, a reasonable juror could question the legitimacy of defendant's reason and find it to be pretextual given that defendant told plaintiff not to come back to work long before October 2008 for reasons which it attributed to plaintiff's disability-*i.e.*, plaintiff's absences from work and his alleged inability to be at the office full-time. *See Cicero v. Borg-Warner Auto, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) (an employer's changing rationale for making adverse employment decision can be evidence of pretext). Furthermore, as stated above, even if defendant were considering termination prior to the meeting, the decision was not set in stone and the record demonstrates the possibility that plaintiff's threat of a lawsuit prompted the final termination decision. Defendant should not be granted summary judgment in its favor on the retaliation claim.

## C. ERISA Claim

Count V of the second amended complaint alleges that UPM granted "certain employee benefits" to plaintiff and that UPM "knowingly terminated Plaintiff's employment to avoid the vesting of these benefits in violation of ERISA." (Doc. 29, ¶¶ 48-49). Plaintiff does not identify these benefits in the second amended complaint. Defendant argues it is entitled to summary judgment on plaintiff's ERISA claim because plaintiff cannot show that UPM had the specific intent to violate ERISA or that the intent to avoid the vesting of benefits was a determining factor in the elimination of his position. UPM further contends that even if plaintiff's position had not

29

been eliminated, plaintiff would not have been eligible for benefits because he was not actively at work at the time benefits would have vested. (Doc. 33 at 17, citing Doc. 32, Exh. F, McAlpin Depo, p. 62).

In his response to the motion for summary judgment, plaintiff claims that by terminating him on December 31, 2008, UPM "divested him of valuable benefits including a substantial life insurance policy." (Doc. 44 at 15). Plaintiff claims that a life insurance policy would have vested had he worked one more day. (*Id.* at 33). He alleges that the proximity of his termination to attaining eligibility for substantial benefits is sufficient to establish his prima facie case of an ERISA violation, especially when coupled with evidence that UPM took his proximity to attaining eligibility for benefits into account in making the termination decision. (*Id.*). Plaintiff contends there is also evidence of pretext because although UPM alleges he would not have been eligible for benefits since "he was not actively at work," there is no evidence that the term "actively at work" excluded working with accommodations; UPM took his disability into account when deciding to terminate his employment; and when he asked to work with accommodations, Kennard expressed concern only with learning the amount of plaintiff's medical expenses. (*Id.*). Plaintiff's counsel clarified at oral argument that plaintiff is claiming his termination divested him both of health benefits and of coverage under the company life insurance policy, which would have remained in force for plaintiff had he not been terminated.

Section 510 of ERISA states: "It shall be unlawful for any person to discharge . . . a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled" under an employee benefit plan. 29 U.S.C. § 1140. In order to state a claim under § 510, the plaintiff must demonstrate through either direct or

30

circumstantial evidence that the defendant had a "specific intent to violate ERISA." *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997) (citing *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992)). In the absence of direct evidence, the plaintiff must establish a prima facie case by showing the existence of "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Id.* (citations omitted).

If the plaintiff establishes a prima facie case, the defendant can rebut the presumption of impermissible action by introducing evidence of a legitimate, nondiscriminatory reason for its challenged action. *Id.* (citing *Humphreys*, 966 F.2d at 1043). The plaintiff then has the burden to show that the defendant's explanation was pretextual. *Id.* While the plaintiff need not show that the defendant's sole purpose was to interfere with the plaintiff's entitlement to benefits, the plaintiff must "either prove that the interference was a motivating factor in the employer's actions or prove that [the] employer's proffered reason is unworthy of credence." *Id.* (citing *Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1413 (6th Cir. 1996) (quoting *Humphreys*, 966 F.2d at 1043).

Although it is not part of the prima facie case, plaintiff must demonstrate a "causal link" between the adverse employment decision and the loss of benefits in order to establish a § 510 claim. *Id.* (citing *Humphreys*, 966 F.2d at 1044). Specifically, "in order to survive [a] motion for summary judgment, plaintiff must come forward with evidence from which a reasonable jury could find that defendants' desire to avoid [benefit] liability was a determining factor in plaintiff's discharge." *Humphreys*, 966 F.2d at 1044. Thus, unless the issue of benefits is shown to be causally linked to the employer's decision to terminate an employee, the termination

decision will not violate ERISA. *Schweitzer v. Teamster Local 100,* 413 F.3d 533, 537 (6th Cir. 2005) (*citing Mattei v. Mattei,* 126 F.3d 794, 808 (6th Cir. 1997) (requiring that to establish a violation of § 510, a plaintiff must produce evidence indicating a causal connection between a defendant's challenged action and its interference with plaintiff's ability to receive an identifiable benefit)).

Plaintiff has come forward with sufficient evidence to establish a prima facie case of a § 510 violation. The evidence shows that UPM changed life insurance coverage for its employees to coverage under O'Neal Steel's policy effective January 1, 2009, the day after plaintiff's termination. (Doc. 32, Exh. F, McAlpin Depo., p. 49). Although McAlpin asked the Human Resources supervisor at O'Neal if plaintiff could obtain coverage under the new life insurance policy, she was told he could not. (*Id.*). McAlpin testified that she informed Kennard that plaintiff wanted the life insurance, and she acknowledged that plaintiff would have been covered by the policy if he had been terminated one day later. (*Id.* at 49-51). The evidence establishes that plaintiff would have obtained substantial benefits under the new life insurance policy had his termination occurred *one day past the end date of his contract*, which was December 31, 2008; plaintiff actively pursued those benefits; and the timing of his termination precluded him from obtaining those benefits. This evidence is sufficient to establish a prima facie case under § 510. *See Humphreys*, 966 F.2d at 1043-44 (discharge in close proximity to vesting of benefits may satisfy prima facie case).

As explained earlier in this opinion, defendant has offered a legitimate reason for plaintiff's termination. However, plaintiff has come forward with evidence of a causal link between the vesting of his life insurance benefits and the termination decision. It is for the jury

32

to decide defendant's true motivation for the termination decision based on the evidence presented and to determine whether defendant acted with the intent to avoid the vesting of life insurance benefits. Accordingly, defendant should not be granted summary judgment on plaintiff's ERISA claim.[10]

## IV. Conclusion

For these reasons, the Court hereby RECOMMENDS that defendant's motion for summary judgment (Doc. 31) be GRANTED as to plaintiff's age discrimination claims and DENIED as to plaintiff's disability discrimination, retaliation, and ERISA claims.

Date: 11/17/11

Karen L. Litkovitz
United States Magistrate Judge

---

[10]Insofar as plaintiff seeks to bring an ERISA claim based on interference with the attainment of health care benefits, he has failed to present a cognizable claim. Plaintiff's counsel stated at oral argument that prior to plaintiff's termination, defendant made a company-wide switch to a health care plan with a lower lifetime maximum based on concerns over plaintiff's health care costs. However, plaintiff does not allege that he was denied coverage under this plan. Moreover, although plaintiff's counsel alleged that plaintiff's coverage under the new plan would have continued had he not been terminated, plaintiff did not submit any evidence demonstrating a causal link between coverage under the new health care plan and his termination. Thus, plaintiff should not be permitted to pursue an ERISA claim based on the alleged denial of health care benefits.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JAMES HUGGARD,                                              Case No. 1:10-cv-063
           Plaintiff,                                    Dlott, J.
                                                           Litkovitz, M.J.

vs


UNITED PERFORMANCE
METALS, INC.
           Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).